STATE of Delaware,

v.

Ronald RUTHARDT, Defendant.

No. 9405012402.

Superior Court of Delaware,
New Castle County.

Submitted: Feb. 21, 1996.
Decided: March 21, 1996.

Scott Stein, Attorney General's Office, Wilmington, for State.

Kevin P. O'Neill, Heyden, Kania & O'Neill, Wilmington, for Ronald Ruthardt.

## OPINION

CARPENTER, Judge.

Ronald Ruthardt was arrested on May 14, 1994, and charged with Driving While Under the Influence, 21 *Del.C.* § 4177, and various other motor vehicle violations.[1] Before the Court is the State of Delaware's Motion in Limine to Admit Evidence Relating to the Horizontal Gaze Nystagmus Field Sobriety Test ("HGN"). The State requests the Court to admit HGN for the purpose of determining probable cause and as evidence of impairment and/or intoxication at trial. Because the State's Motion presents issues of first impression in Delaware, the Court has held extensive evidentiary hearings on the matter and has required full briefing from the parties prior to ruling on such issue. This is the Court's ruling granting the State's Motion for the purpose of determining probable cause to arrest and as corroborating evidence that the defendant was operating a vehicle while "under the influence" in violation of 21 *Del.C.* § 4177(a).[2] This ruling is limited, however, by a finding that HGN testing is not admissible in any criminal prosecution to independently and conclusively establish that a defendant's blood alcohol content equalled or exceeded a

specific concentration and is subject to the requirement that the State establish a proper foundation consistent with the opinion set forth below.[3]

### I. *Facts*

On May 14, 1994, Corporals French and Coyle of the Delaware State Police were conducting a security checkpoint for the LPGA Golf Tournament on Rockland Road near Route 141. Upon reaching the roadblock, the defendant, Ronald Ruthardt, operating a 1992 Chevrolet Camaro, failed to heed Corporal French's signal to stop his vehicle. Instead, he drove through the roadblock and proceeded on Rockland Road until pulling into the parking lot of the DuPont Country Club. Corporal French notified other officers in the area of the defendant's action, and thus, the defendant was confronted by officers as he exited his vehicle. Corporal French immediately responded to the parking lot and positively identified the defendant as the operator of the vehicle. Because of the presence of alcohol on defendant's breath, his bloodshot eyes and muddled speech, Corporal French requested the defendant to undergo a battery of field sobriety tests, which included the HGN test.[4]

---

1. Additionally, the defendant is charged with Driving During a Period of Suspension, 21 *Del.C.* § 2756, Failure to Provide Proof of Insurance, 21 *Del.C.* § 2118, Failure to Stop at the Command of a Police Officer, 21 *Del.C.* § 4103(b), No Passing Zone Violation, 21 *Del.C.* § 4120, and Unregistered Motor Vehicle, 21 *Del.C.* § 2115.

2. Pursuant to 21 *Del.C.* § 4177(a), it is a violation if a person drives a vehicle: "(1) when the person is under the influence of alcohol; (2) when the person is under the influence of any drug; (3) when the person is under the influence of a combination of alcohol and any drug." Section 4177(c)(5) defines "while under the influence" as meaning "that the person is, because of alcohol or drugs or a combination of both, less able than the person would ordinarily have been, either mentally or physically, to exercise clear judgement, sufficient physical control, or due care in the driving of a vehicle." *See also* Jonathan D. Cowan & Susannah G. Jaffee, *Proof and Disproof of Alcohol–Induced Driving Impairment Through Evidence of Observable Intoxication and Coordinating Testing*, 9 Am.Jur. Proof of Facts 3d 459, 474 (1989) (defining and discussing legal criterion associated with "under the influence").

3. The State's Motion sought only to admit pass/fail results of HGN and not the police officer's estimate of blood alcohol concentration based upon HGN. Accordingly, nothing in this opinion should be interpreted as granting the State carte blanche permission to offer HGN evidence to quantify a defendant's blood alcohol concentration as set forth in § 4177(a)(4) & (5). Pursuant to § 4177(a): "No person shall drive a vehicle ... (4) when the person's alcohol concentration is .10 or more; or (5) when the person's alcohol concentration is, within 4 hours after the time of driving, .10 or more."

 Section 4177, as quoted above, was revised and became effective in 1995. Because the defendant was arrested and charged in May of 1994, under the old version of § 4177, nothing in the Court's opinion shall be construed as allowing the State to offer testimony on the results of defendant's HGN test to raise the mandatory presumption found in 21 *Del.C.* § 4177(b) that he was driving "under the influence." *See* 21 *Del.C.* § 4177(b) (1974).

4. The HGN test is one of several field sobriety tests recommended by the National Highway Traffic Safety Association to assist officers in

From the results of the field tests performed on the scene, Corporal French informed the defendant that he was under arrest for operating a motor vehicle while under the influence of alcohol. The defendant was taken into custody, transported to police headquarters and, subsequently, charged with Driving While Under the Influence in violation of 21 *Del.C.* § 4177, Driving During a Period of Suspension, 21 *Del.C.* § 2756, Failure to Provide Proof of Insurance, 21 *Del.C.* § 2118, Failure to Stop at the Command of a Police Officer, 21 *Del.C.* § 4103(b), No Passing Zone violation, 21 *Del.C.* § 4120, and Unregistered Motor Vehicle, 21 *Del.C.* § 2115.

Thereafter, the State filed a Motion In Limine seeking to admit evidence relating to the HGN field sobriety test for the purpose of establishing probable cause to arrest the defendant and as independent, direct evidence of his level of intoxication. The defendant countered the motion arguing that HGN evidence is prejudicial and not sufficiently reliable to satisfy the standard for admitting scientific evidence under the Delaware Rules of Evidence. In order to give the parties the opportunity to present expert testimony on the principles and use of the HGN test, the Court held a series of lengthy evidentiary hearings on December 19, 1994, and April 3–5, 1995. Six witnesses testified on behalf of the State. They were: Dr. Constantine Forkiotis, a behavioral optometrist; Detective Mark Hawk and Corporal Linda French of the Delaware State Police, the training and the arresting officer, respectively; Sergeant Thomas Page of the Los Angeles Police Department, an expert in the field of alcohol and drug recognition; Dr. Marcilline Burns, a research psychologist specializing in the effect of alcohol on behavior; and Dr. Grant Lui, a neuro-ophthalmologist. The defendant offered the testimony of Dr. Spurgeon Cole, a psychologist specializing in the area of test evaluation and administration. Subsequently, after the hearing, this issue was briefed by the parties. Upon reviewing the briefs, the Court submitted specific questions to the parties, to which they filed written responses.

## II. *Horizontal Gaze Nystagmus Test*

■ Nystagmus is a well-known physiological phenomenon defined as "a rapid involuntary oscillation of the eyeballs." *Webster's Ninth Collegiate Dictionary* 813 (1989); *see* 2 Donald H. Nichols, *Drinking/Driving Litigation* § 26:01, at 1 (1990). Horizontal gaze nystagmus ("HGN") is the inability of the eyes to maintain visual fixation as they are turned horizontally side to side. Goldberg, *Behavioral and Physiological Effects of Alcohol on Man*, 28 Psychosomatic Med. 570, 593 (1966) [hereinafter *Behavioral Man* ]; *The Merck Manual of Diagnosis and Therapy* 1980 (14th ed. 1982) [hereinafter *Merck Manual* ]. This phenomenon became of significant interest to the law enforcement community as research studies found that HGN, or the oscillation of the eyeball, may be aggravated by central nervous system depressants such as alcohol or barbiturates. *See, e.g.,* Gregory W. Good & Arol R. Ausburger, *Use of Horizontal Gaze Nystagmus as a Part of Roadside Sobriety Testing*, 63 Am.J. Optometry & Physiological Optics 467 (1986).

In 1977, the National Highway Traffic Safety Association ("NHTSA") conducted a study to evaluate the effectiveness of the HGN test along with five other roadside field sobriety tests in order to determine the three best tests for detecting alcohol impairment. NHTSA DOT HS–802–424, *Psychophysical Tests for DWI Arrests* (1977) (*"1977 NHTSA Study "*). At the evidentiary hearing before this Court, Dr. Burns, Director of the Southern California Research Institute and one of the researchers involved in the 1977 NHTSA study, testified that the results indicated that the walk-and-turn test, the one-leg stand test and the HGN test were the most highly effective methods for detecting alcohol-impairment and, out of these three field sobriety tests, HGN was the most sensitive for assessing whether a driver is legally intoxi-

determining whether an operator of a vehicle is driving while intoxicated. *See* Burns & Muskowitz, *Psychophysical Test for DWI Arrest*, U.S. Dept. of Transportation Rep. No. DOT–HS–802–424 (1977) (*"NHTSA 1977 Study "*). The theory behind the test is that there exists a medically proven correlation between the consumption of alcohol and the existence of nystagmus in the human eye. For further explanation of HGN see Discussion, *infra*, at 352–353.

cated. Subsequently, in 1984, the NHTSA published a training manual for the purpose of teaching police officers the proper execution of the walk-and-turn, one-leg stand and HGN test. NHTSA, DOT–HS–806–512, *Improved Sobriety Testing* (1984) (*reprinted in* 2 Donald H. Nichols, *Drinking/Driving Litigation,* ch. 26, app. A (1985)) (*"NHTSA Training Manual"*). The substance of this manual is utilized by the Delaware State Police in its DUI training of officers.[5]

As Corporal French and Detective Mark Hawk testified at the hearing, the NHTSA's guidelines direct the officer administering the HGN test to stand directly in front of the driver and require the individual to stand at attention, feet together and arms to the side. *NHTSA Training Manual, supra,* at 3–4. To ensure accuracy, the NHTSA manual further instructs the officer to perform the test outside of the automobile in a well-lit area. *Id.* If the driver wears glasses, they should be removed to ensure proper observation by the officer; and if the suspect wears hard contacts lenses the test should not be administered because the lenses may dislodge and interfere with eye movement. *Id.* Next, the officer is to instruct the driver to focus the eyes on an object (in this case, a pen) held fifteen inches from the driver at eye level. *Id.* The officer then gradually moves the object, or stimulus, horizontally out of the driver's field of vision towards the ear and watches the driver's eyeball to detect involuntary jerking—or nystagmus. *Id.* The police officer utilizes the procedure as an indication of whether the driver is under the influence of alcohol by observing: (1) the inability of each eye to follow movement smoothly ("lack of smooth pursuit"), (2) conspicuous nystagmus, or jerking, at maximum deviation and (3) the onset of nystagmus

prior to reaching a 45 degree angle in relation to the center point. *Id. See State v. Witte,* 251 Kan. 313, 836 P.2d 1110, 1112 (1992) (describing HGN testing procedures as designed by NHTSA). The test involves three distinct steps, or horizontal passes, which are performed for each eye. Thus, the police officer notes six testing points in order to determine the pass/fail results. For each occurrence of nystagmus observed by the police officer, the driver receives a point for a maximum score of six; a score of four or more provides an indication that the individual is intoxicated and is considered a failure of the test.[6] *See NHTSA Training Manual, supra,* at 3–4 (discussing in-depth administration and scoring of the HGN test); *see also* 2 Nichols, *Drinking/Driving Litigation* § 26:01, p. 159 (1992 Supp.).

Having discussed the characteristics of the test itself, the Court now turns to the critical questions presented *sub judice:* (a) whether the HGN evidence may be admitted for the purpose of establishing probable cause; (b) whether HGN evidence is "scientific" evidence and, if so, (c) whether HGN evidence is reasonably reliable on the issue of alcohol impairment so as to satisfy the standard for admission of scientific evidence pursuant to the Delaware Rules of Evidence.

### III. *HGN and Probable Cause*

 It is a generally accepted principle in Delaware, as well as throughout the country, that while probable cause may not rest on mere suspicion, it need not rise to the level necessary to sustain a conviction, nor rest on sufficient evidence to convict.[7] *See Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *State v. Maxwell,* Del.Supr., 624 A.2d 926

---

**5.** Corporal French testified that she was certified by the Delaware State Police in administering the HGN test after successfully completing a three day DUI training course, which included classroom instruction and subject testing. The training course was instructed by Detective Mark Hawk of the Delaware State Police, a HGN instructor certified by the National Highway Traffic Safety Association ("NHTSA").

**6.** Corporal French testified that Ruthardt received a score of six on the HGN test because his eyes displayed jerky pursuit, endpoint nystag-

mus, and nystagmus prior to reaching a 45 degree angle in both eyes.

**7.** The United States Supreme Court in *Brinegar,* characterized the probable cause determination stating:

> In dealing with probable cause ... we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable [people], not legal technicians act.

338 U.S. at 175, 69 S.Ct. at 1310.

(1993). Information sufficient to raise a suspicion of criminal behavior by a defendant is adequate and need not satisfy the standards for admissibility under the Delaware Rules of Evidence. *See* Super.Ct.Crim.R. 4(b); *see also State v. Lawrence Baldwin,* Del.Super., Cr.A. No. K94–11–0016, Terry, R.J. (May 12, 1995), Letter Op. at 4. In *Maxwell,* the Delaware Supreme Court characterized the probable cause determination stating:

> A finding of probable cause does not require the police to uncover information sufficient to prove a suspect's guilt beyond a reasonable doubt or even to prove that guilt is more likely than not.... [T]o establish probable cause, the police are only required to present facts which suggest, when those facts are viewed under the totality of the circumstances, that there is a fair probability that the defendant has committed a crime.

624 A.2d at 930–31. As such, the Court now must determine whether the HGN provides reasonable, trustworthy information sufficient to lead a reasonable person to conclude that the failure of the test would reflect a fair probability that the driver is under the influence and intoxicated.

It is evident to the Court from the voluminous scientific and legal articles and studies on the HGN test, as well as the convincing testimony of Dr. Lui, that the underlying scientific basis for HGN is a well known physiological phenomenon that is widely defined, described and accepted in the medical community and has been effectively utilized by law enforcement as an aid in detecting DUI driving for many years. *Dorland's Illustrated Medical Dictionary* (25th ed. 1974); *Stedman's Medical Dictionary* (5th Lawyers ed. 1982); *The Merck Manual, supra.* In fact, well before 1977, when the NHTSA published its findings on the reliability of HGN, many highway safety agencies recognized HGN as an effective tool for detecting those illegally driving under the influence of alcohol. *1977 NHTSA Study, supra.* The *1977 NHTSA Study* reports that of the six most sensitive field sobriety tests used by police departments around the country, HGN is the most reliable for predicting level of impairment. Moreover, from the Court's re-

view of cases directly addressing the admissibility of the HGN test, it appears that nearly all courts have, at a minimum, found HGN evidence sufficiently reliable for establishing probable cause. *State v. Grier,* Alaska Ct. App., 791 P.2d 627, 631 n. 2 (1990) (finding HGN evidence sufficiently reliable in conjunction with other competent evidence to establish probable cause to arrest); *see also Schultz v. State of Maryland,* Md.Ct. Spec.App., 664 A.2d 60, 68–69 (1995) (admitting test evidence with proper foundation for both probable cause and as substantial evidence of intoxication); *State v. Superior Court,* Ariz.Supr., 149 Ariz. 269, 718 P.2d 171, 176–177 (1986). In fact, the Delaware Superior Court has previously recognized that the test results are probative in determining whether probable cause exists. *See Baldwin, supra,* at 68–69. In *Baldwin,* Judge Terry admitted HGN evidence for the purpose of determining probable cause because he viewed such evidence as a critical and legitimate factor in the officer's decision to arrest for driving while "under the influence."

■ Judicial assessment of probable cause, however, need not rest on whether information is widely known or generally accepted. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Maxwell,* 624 A.2d at 930–31. Thus, if HGN evidence possesses some indicia of reliability such that a reasonable person could conclude from the results that there is a fair probability the driver is "under the influence," then it is appropriate evidence for the probable cause determination. Dr. Burns testified that in a survey of the first 800 officers trained in the HGN test, over 80 percent found HGN to increase their accuracy in recognizing impaired drivers. Sergeant Page also testified that, having used the test over three thousand times, he found the test to be over 90 percent accurate in determining alcohol impairment. He indicated that the HGN test is held in such high esteem in the law enforcement community that police officers rely on it to aid in the arrest decision even in jurisdictions where the test is not admissible in Court. This is the case with officers Hawk and French. Both officers testified that, in their experience in making arrests for driv-

ing while under the influence, they found HGN a reliable field test for predicting whether a person's blood alcohol content is over the legal limit and whether the individual was "under the influence" of alcohol. Corporal French testified that for the 30–35 individuals to which she had administered the HGN test and had subsequently arrested, her conclusions on the individual's level of intoxication were generally consistent with the actual results of the intoxilator testing.

 From the foregoing, the Court is convinced that the testimony at the evidentiary hearing regarding the reliability of the HGN test more than adequately establishes that, in the hands of a trained police officer, the test is reasonably trustworthy when used in conjunction with other field tests to establish probable cause to arrest.

## IV. *HGN and Admission at Trial*

The Court's foregoing decision that the HGN test is sufficiently reliable to establish probable cause does not automatically imply that the test may be admitted as substantive evidence that the driver was "under the influence" in violation of 21 *Del.C.* § 4177(a)(1)–(3). The question of admissibility at trial is governed by the Delaware Rules of Evidence, which require the Court to balance the probative value of the evidence with the potential prejudice to the defendant because of misunderstanding or misuse by the jury. D.R.E. 403. In addressing the admissibility of HGN under the Delaware Rules of Evidence, the Court must first consider the threshold question of whether HGN evidence must satisfy the standard for admission of new and novel "scientific evidence."

### A. *Scientific Evidence*

Since the endorsement of the HGN test by the NHTSA in 1977, the admissibility of HGN test results has become a hotly debated issue in state and federal courts. In considering admissibility, courts have disagreed on whether the test is "scientific evidence" or whether it is based on common knowledge. The majority view is that the HGN test is a "scientific technique requiring compliance with the appropriate standard governing the admissibility of scientific evidence." [8] In contrast, a minority of jurisdictions considering admissibility find the test to be no more scientific than other field sobriety tests and, therefore, admissible without scientific foundation.[9] In *State v. Nagel,* the Ohio Supreme Court characterized the minority's rationale stating:

> It is not comparable ... to a polygraph test which requires the use of a machine, the scientific reliability of which may be questioned. The ... [HGN] test, as do the other commonly used field sobriety tests, requires only the personal observations of the officer administering it. It is objective in nature and does not require expert interpretation.

30 Ohio App.3d 80, 506 N.E.2d 285, 286 (1986).

 Contrarily, the majority's approach is premised on the view that the HGN test is distinguished from other field sobriety tests because it rests entirely upon scientific principles rather than on concepts within the common knowledge and experience of lay jurors. After careful review of the two alternative positions, this Court concurs with the

**8.** *See, e.g., Schultz,* 664 A.2d at 66 (finding HGN test scientific and required to satisfy *Frye* test); *State of Oregon v. O'Key,* 321 Or. 285, 899 P.2d 663, 674 (1995); *People v. Leahy,* 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 675–76, 882 P.2d 321, 333–34 (1994); *State v. Klawitter,* Minn.Supr., 518 N.W.2d 577, 584–86 (1994) (finding HGN test not "emerging scientific technique[ ]," but is " 'scientific' in the sense that we use the term"); *State v. Garrett,* 119 Idaho 878, 811 P.2d 488, 490 (1991); *Malone v. City of Silverhill,* Ala.Cr. App., 575 So.2d 101, 105 (1989), *rev'd on other grounds,* 575 So.2d 106 (1990); *State v. Barker,* 179 W.Va. 194, 366 S.E.2d 642 (1988); *State v. Clark,* 234 Mont. 222, 762 P.2d 853 (1988); *Commonwealth v. Miller,* 367 Pa.Super. 359, 532 A.2d 1186, 1189 (1987) ("Results of the HGN test are

... scientific evidence based on the scientific principle that consumption of alcohol causes the type of nystagmus measured by the HGN test"); *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d 551 (1986); *Superior Court,* 718 P.2d at 181; *People v. Buening,* 229 Ill.App.3d 538, 170 Ill.Dec. 542, 547–48, 592 N.E.2d 1222, 1227–28 (1992).

**9.** *See, e.g., State v. Sullivan,* 310 S.C. 311, 426 S.E.2d 766 (1993); *Whitson v. State,* 314 Ark. 458, 863 S.W.2d 794, 798 (1993); *State v. Murphy,* Iowa Supr., 451 N.W.2d 154 (1990); *State v. Nagel,* 30 Ohio App.3d 80, 506 N.E.2d 285, 286 (1986); *State v. Garris,* La.Ct.App., 603 So.2d 277, 282, *writ denied,* 607 So.2d 564 (1992).

majority's view that HGN is a scientific test.[10] The HGN test provides evidence that is based on the scientific theory that there is a causal relationship between the consumption of alcohol and the degree of horizontal nystagmus present in the eye. *See* 84 *J.Crim.L. & Criminology, supra,* at 203 (noting HGN test premised on theory that alcohol impacts the automatic tracking mechanisms of the human eye). It is this scientific principle, rather than common knowledge, that provides legitimacy for HGN testing. Moreover, the existence of horizontal nystagmus is a manifestation of alcohol consumption that is not readily known or understood by the jury. Other field tests, such as the walk-and-turn and the one-leg stand test are essentially personal observations made by a police officer of a suspect's coordination and balance. The principle upon which these tests are based, that alcohol impairs coordination, is not beyond the common knowledge or reasoning of the ordinary juror. Thus, for the foregoing reasons, the Court concludes that HGN evidence is scientific and, therefore, must satisfy the pertinent Delaware Rules of Evidence governing the admission of such evidence.[11]

### B. *Delaware Rules of Evidence and HGN*

■ In contrast to many states, the admission of new or novel scientific evidence in Delaware is governed by the pertinent Delaware Rules of Evidence, and is not limited solely to the "general acceptance" requirements of the *Frye* test.[12] *Nelson v. State,* Del.Supr., 628 A.2d 69, 73–4 (1993) (finding that basic principles in *Frye* protected under current [Delaware] standard that opinions may be based on information, tests or techniques that are reasonably relied upon by experts in the field); *Santiago,* 510 A.2d at 489 (*Frye* not "sole test" for judging admissibility); *Fensterer,* 493 A.2d at 962 n. 3, *rev'd on other grounds,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (same). In *State v. Pennell,* Del.Super., 584 A.2d 513, 515 (1989), Judge Gebelein astutely identified the following factors governing the admission of new and novel scientific evidence under the Delaware Rules of Evidence: (1) the expert being offered is qualified; (2) the evidence offered is otherwise admissible, relevant and reliable; (3) the specialized knowledge being offered will assist the trier-of-fact in understanding the evidence or in determining a factual issue; (4) the scientific technique and its underlying principles are reasonably relied upon by the experts in the field; and (5) such evidence would not create unfair prejudice, confusion of issues or mislead the jury. Such factors are now generally referred to as the *Pennell* standard.

■ In applying these factors to this case and the question of the admission of HGN

---

**10.** In thus ruling, the Court joins with courts in the states of Arizona (*Superior Court,* 718 P.2d at 181), Alabama (*Malone,* 575 So.2d at 105), California (*Leahy,* 882 P.2d at 333–34), Georgia (*Manley v. State,* 206 Ga.App. 281, 424 S.E.2d 818, 820 (1992)), Idaho (*State v. Garrett,* 811 P.2d at 490), Illinois (*People v. Vega,* 145 Ill.App.3d. 996, 99 Ill.Dec. 808, 811–12, 496 N.E.2d 501, 504–05 (1986)), Kansas (*State v. Witte,* 251 Kan. 313, 836 P.2d 1110 (1992)), Maryland (*Schultz,* 664 A.2d at 66), Minnesota (*Klawitter,* 518 N.W.2d at 584–86), Missouri (*State v. Wheeler,* Mo.Ct.App., 764 S.W.2d 523, 524–25 (1989)), Montana (*Clark,* 762 P.2d at 856), Nebraska (*Borchardt,* 395 N.W.2d at 559), New York (*People v. Quinn,* N.Y.Dist.Ct., 153 Misc.2d 139, 580 N.Y.S.2d 818, 826 (1991), *rev'd on other grounds,* 158 Misc.2d 1015, 607 N.Y.S.2d 534 (1993)), North Dakota (*City of Fargo v. McLaughlin,* N.D.Supr., 512 N.W.2d 700, 707 (1994)), Oregon (*O'Key,* 899 P.2d at 674), Pennsylvania (*Miller,* 532 A.2d at 1189), Texas (*Emerson v. State,* Texas Crim.App., 880 S.W.2d 759, *cert. denied,* —— U.S. ——, 115 S.Ct. 323, 130 L.Ed.2d 284 (1994)), Washington (*State v. Cissne,* 72 Wash.App. 677, 865 P.2d 564, 568 (1994)) and West Virginia (*State v. Barker,* 179 W.Va. 194, 366 S.E.2d 642, 646 (1988)).

**11.** The Delaware Supreme Court has previously identified the applicable Delaware Rules of Evidence pertaining to the admission of scientific evidence as including Rule 401, 402, 702 and 703. *See Santiago v. State,* Del.Supr., 510 A.2d 488, 489 (1986); *Fensterer v. State,* Del.Supr., 493 A.2d 959, 962 n. 3, *rev'd on other grounds,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

**12.** Pursuant to the *Frye* standard, the admission of scientific evidence turns on whether the principle or technique has gained "general acceptance." Most jurisdictions that have previously considered the admission of HGN evidence evaluated the test under the rigid *Frye* standard. *See, e.g., Schultz,* 664 A.2d at 65 (holding HGN evidence must satisfy *Frye* "general acceptance test"); *Superior Court,* 718 P.2d at 177 (finding HGN test admissible under *Frye* "general acceptance test").

evidence, it is clear to the Court that an opinion on a defendant's performance on the HGN test, if based on reasonably accepted facts and established procedures, would be relevant and otherwise admissible in a DUI case. Likewise, it is also apparent to the Court that such testimony would assist the trier-of-fact in determining the central issue in a DUI case—whether the defendant was "under the influence" of alcohol. Thus, in determining the admission of HGN evidence the Court must focus on the remaining three issues:

(1) Is HGN evidence sufficiently reliable so as to be reasonably relied upon by experts in the relevant scientific community? [13]

(2) Will admission of HGN evidence create unfair prejudice, confusion of issues, or mislead the jury?

(3) Are Delaware police officers fully qualified to testify as experts on the HGN test?

In addressing the foregoing three questions, the Court relies on the extensive scientific testimony and evidence offered at the evidentiary hearing, as well as the pertinent legal and medical literature on the subject received into evidence.

1. *Reasonably Reliable and Relied Upon by Experts*

Although the HGN test is a new and novel one for determining whether a driver is legally impaired by alcohol in Delaware, it is not regarded as such in the law enforcement and medical communities. Law enforcement officers have utilized the HGN test for decades. *See Whitson v. State,* 314 Ark. 458, 863 S.W.2d 794, 796–97 (1993) (noting that HGN test in use for over 30 years). Sergeant Page, Detective Hawk and Corporal French all testified at the evidentiary hearings that the law enforcement community considers HGN a reliable and accurate field test. Similarly, Dr. Lui, a specialist in neu-

ro-ophthalmology, confirmed that HGN is widely accepted in the medical community as an indicator of alcohol impairment. Moreover, he emphasized that two of the foremost authorities in the field of neuro-ophthalmology, Dr. Robert Baloh and Dr. Vincente Honrubia, believe nystagmus to be a reliable sign of alcohol impairment. *See* Baloh and Honrubia, *Clinical Neurophysiology of Vestibular System* 253 (2ed. Davis Co.). These opinions were confirmed by Dr. Fiorkiotis and even the defendant's expert, Dr. Cole, did not dispute that the underlying theory of HGN evidence is one reasonably relied upon by experts in the relevant scientific fields. In addition, there is extensive scientific literature dating back to the 1950s that thoroughly examines and critiques the HGN test and the theory underlying the test—that there is a strong correlation between the amount of alcohol a person consumes and the onset of nystagmus. *See, e.g., J. Am. Optometric Assoc.* 653 (Sept. 1993) (endorsing use of HGN in field sobriety testing); Adams and Victor, *Principles of Neurology* 218 (4th ed. 1991) ("Drug intoxication is the most frequent cause of induced nystagmus. Alcohol … [is] the common offender[ ]."); Tennant, *The Rapid Eye Test to Drug Abuse,* 84 Postgraduate Med. 108 (July 1988); C.J. Forkiotis, *Optometric Expertise: The Scientific Basis for Alcohol Gaze Nystagmus,* 59 Curriculum II 1, 3 (April 1987); Good and Augsburger, 93 *Am.J. Optometry & Physiological Optics* 467 (June 1986). Dr. Burns testified that both the 1977 and 1981 NHTSA study found HGN to be the most accurate and sensitive field sobriety test for assessing whether a driver was legally impaired by alcohol. She emphasized that the *1977 NHTSA Study* found HGN to be 77 percent accurate in determining alcohol impairment when used by itself and, when used in conjunction with other field tests, the accuracy rate for detection reportedly increased to as high as 80 to 88 percent.[14] *See 1977 NHTSA Study, su-*

**13.** In *O'Key,* the Oregon Supreme Court identified the disciplines that comprise the "relevant scientific community" as including experts in behavioral psychology, highway safety, neurology, criminology, ophthalmology, optometry and pharmacology. *899 P.2d at 684.* This Court concurs with the *O'Key* court's assessment of those disciples concerned with the validity and

reliability of the HGN test and, thus, constituting the "relevant scientific community" for the purpose of this opinion.

**14.** In addition, a recent study published in July of 1995 that addressed the validity of field sobriety tests for lower BAC limits found HGN to be valid and the most reliable field test for detecting

*pra.* Moreover, supporters favor the test because it is easy to administer, cannot be voluntarily controlled, is not affected by an individual's tolerance to alcohol and language barriers are minimized.

Not only is HGN evidence viewed as reasonably reliable by experts, it is also recognized as such by the majority of foreign jurisdictions that have considered the issue of the admission of HGN evidence as substantive evidence of intoxication. In fact, the majority has found HGN evidence to be sufficiently reliable evidence of alcohol impairment under the rigid *Frye* "general acceptance" standard. In *Superior Court,* the first and seminal case in which the HGN test was challenged, the Arizona Supreme Court ruled the test results admissible as evidence of the presence of alcohol. 718 P.2d at 178. In *Superior Court,* the Court found the HGN test sufficiently reliable because the weight of the scientific literature indicated that experts in the relevant fields did not dispute the correlation between alcohol and the angle of onset. *Id.* The Court, therefore, concluded that although the scientific publications accepting the reliability of the HGN test were not voluminous, the test satisfied the *Frye* "general acceptance" test. *Id.* Accordingly, the Court permitted HGN to be admitted for the purpose of establishing the presence of alcohol in the blood, but not to establish a blood alcohol content ("BAC") of .10 or more.

Since *Superior Court,* the validity and reliability of the test has widely been evaluated by experts in the relevant fields and addressed by courts in at least twenty-seven states. *See, e.g., State v. Armstrong,* La.Ct. App., 561 So.2d 883 (1990); *Murphy,* 451 N.W.2d at 154; *Clark,* 762 P.2d at 853; *State v. Bresson,* 51 Ohio St.3d 123, 554 N.E.2d 1330 (1990); *Richardson v. State,* Tex.Ct. App., 766 S.W.2d 538 (1989); *United States v. Van Griffin,* 874 F.2d 634 (9th Cir.1989); *see also* Ludington, *Impaired Driving: HGN Testing,* 60 A.L.R.4th 1129 (collecting state

and federal cases dealing with the admissibility of HGN evidence). Recently, the Court of Special Appeals of Maryland specifically found HGN evidence admissible under the *Frye* "general acceptance" standard. *Schultz,* 664 A.2d at 69. In doing so, the Court found "that the studies, scientific articles, foreign cases and other literature on the subject ... reveal that most courts and scientific authorities have held the test reliable if properly administered." *Id.* Accordingly, the Court took judicial notice of the reliability of the test under the *Frye* standard and, thus, held that HGN evidence is admissible at trial without further reference to the *Frye* "general acceptance" standard. *Id.*

The few jurisdictions that have evaluated the HGN test under the more flexible inquiry based standard, as espoused by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), have also found the test and principle underlying it— that alcohol induces the onset of nystagmus—scientifically valid and reasonably reliable.[15] *See O'Key,* 899 P.2d at 686. Applying the multi-factor *Daubert* standard in *O'Key,* the Oregon Supreme Court specifically held the test sufficiently reliable so as to be reasonably relied upon by experts in the relevant scientific communities. One such factor the Court considered important in making such determination was the overall general acceptance of the test within the relevant scientific fields and by courts throughout the United States. The Court found that the weight of the scientific evidence and testimony supported a finding that the following propositions have gained general acceptance: (1) HGN is directly correlated with alcohol consumption; (2) its onset and distinctness correlate to BAC; (3) the HGN test is a reliable indicator of whether a driver is impaired by alcohol if performed in conjunction with other field sobriety tests; and (4) officers can successfully be trained to

---

BAC levels from .08 and above. *See* McKnight, Langston, Lange & McKnight, *Development of Standardized Field Sobriety Tests for Lower BAC Limits,* NHTSA Contract DTNH22–92–07000 (July 21, 1995).

**15.** The Delaware standard for admission of scientific evidence mirrors the flexible, multi-factor *Daubert* approach. In fact, the decisional process that is articulated in *Daubert* is, in the Courts view, similar to the process that is articulated by Judge Gebelein in *Pennell.*

perform the HGN test so as to detect alcohol consumption, but not specific BAC levels. Based on the foregoing, the Court admitted the HGN evidence for the limited purpose of establishing that the driver was "under the influence of intoxicating liquor." *Id.*

This advocacy for the HGN test is not without some opposition within the scientific community and among the courts, however.[16] *See State v. Meador*, Fla.Broward Cty.Ct., No. 93–810MM1A, Wright, J. (Feb. 5, 1995) (finding HGN evidence inadmissible because high incidence of false positive arrests resulting from test). As noted by the Kansas Supreme Court in *Witte*, there exist several scientific articles and studies published after the *Superior Court* decision which insist that the HGN test has not gained general acceptance within the scientific community, that researchers disagree over the appropriate angle of onset and that report a high incidence of false positives[17] and less favorable reliability statistics for the HGN test than the NHTSA studies reported.[18] *Witte*, 836 P.2d at 1118–20 (*citing* Rouleau, *Unreliability of the Horizontal Gaze Nystagmus Test*, 4 Am.Jur.P.O.F.3d 439, 446; Norris, *The Correlation of Angle of Onset of Nystagmus with Blood Alcohol Level; Report of a Field Trial*, 25 (No. 6) Journal of Forensics Science Society, 476 (1985) (reviewing and criticizing the efficacy of the HGN test under field conditions for aiding officers in predicting BAC by observing the angle of onset of gaze nystagmus)). In addition, critics attack the reliability of the test on the basis that it fails to take into consideration the percentage of the population that have natural nystagmus without a consumption of alcohol.[19] *See* Eric Harperin & Robert L. Yolton, *Is the Driver Drunk? Ocularmotor Sobriety Testing*, J.Am.Optometric Ass'n 654, 657 (1986). Moreover, several articles maintain that the research procedures in the NHTSA studies are suspect because they fail to describe the conditions under which the field tests were administered. Comment, 84 *J.Crim.L. & Criminology, supra*, at 211. In fact, defendant's expert, Dr. Cole, specifically questioned the legitimacy of the NHTSA results because of the artificial and highly controlled environment in which the tests were conducted and the high incidence of false positives that are reported when the test is administered in the field without such controlled conditions.[20]

---

**16.** The defendant points to three recent Florida trial court decisions in which HGN evidence was ruled inadmissible because of its lack of reliability and potential prejudicial effect. *See* In re: *En Mass Suppression Hearing Field Sobriety Test*, Fla. Palm Beach County Ct., C.A. No. 94–032914TC A08, *et. seq.*, Ciklin, J. (April 5, 1995) (unreported decision) (finding HGN evidence generally accepted, but suppressing evidence for lack of reliability when administered under field conditions); *State of Florida v. Biederwolf*, Fla. Palm Beach County Ct., No. 94–35845–TC08, Maass, J. (March 22, 1995) (unreported decision) (ruling test inadmissible due to prejudicial effect, although finding underlying principles of HGN generally accepted); *Meador, supra,* (presently on appeal to the Florida Supreme Court). *But see State v. Everingham*, Fla. County Ct., No. 92–6933–MM (November 29, 1993) (unpublished opinion) (admitting HGN evidence under *Frye*); *State v. Carriere*, Fla.County Ct. Ap. 8th, 1 FLW 366 (1993); *State v. Harrington*, Fla. County Ct., No. 93–3345–TM (Aug. 27, 1993) (unpublished opinion). Presently, the Florida Supreme Court has not addressed the matter.

Although the Court acknowledges the existence of real concerns with HGN's reliability as expressed by certain Florida trial courts in the aforementioned decisions, it is not persuaded that such concerns warrant complete exclusion of HGN evidence at trial.

**17.** A false positive is a result that indicates an individual was found to be legally impaired by the consumption of alcohol when in fact an individual was below the required blood alcohol level.

**18.** The *Witte* court refused to take judicial notice of the reliability of HGN evidence and remanded the case to the trial court to determine whether HGN satisfied the *Frye* general acceptance test after full evidentiary hearings on the matter. *Witte*, 836 P.2d at 1120; *see also State v. Murphy*, Tenn.Crim.App., 1995 WL 594715 (October 6, 1995) (following *Witte* rationale and remanding case to trial court for State to proffer evidence establishing the general acceptance of HGN evidence).

**19.** Dr. Lui testified, however, that NHTSA guidelines are specifically designed to counter such concerns and that officers can be easily taught to distinguish non-alcohol induced nystagmus from alcohol induced nystagmus.

**20.** He also contended that the 81.2 percent accuracy figure reported in the *1977 NHTSA Study* is overblown and misleading because 73 percent of those subjects reported as correctly classified possessed a blood alcohol content at the aberrant extremes—below 0.05 and above 0.15. In the

Although the defendant points to the bias of the NHTSA studies and the existence of conflicting studies, the Court believes that the foregoing does not affect the admissibility of the HGN evidence. Rather, it clearly is a basis to challenge the appropriate weight that the trier of fact should attribute to it. The bulk of the scientific research indicates that the potential error rate of a properly administered HGN test is lower than all field sobriety tests that are routinely admitted into evidence. Moreover, most of the studies, scientific articles, state court decisions and other literature on the subject that this Court has reviewed establish that the test is a reliable tool if properly administered. In fact, recent cases on HGN evidence reveal that the law has progressed beyond the issue of admissibility towards an emphasis on defining foundation requirements and the qualification of those who administer the test. *See, e.g., Schultz*, 664 A.2d at 72–75 (discussing and evaluating foundation requirements for admission of HGN evidence); *State ex rel Hamilton v. City Court of City of Mesa*, 165 Ariz. 514, 799 P.2d 855, 860 (1990) (finding that proper foundation for testimony on HGN test results includes: description of the officer's training, education and experience in administering test and showing test properly administered).

■■■ The Court acknowledges that there are problems with the physical application of the HGN test in the field and a risk of misdiagnosis because of other causes of nystagmus. Nevertheless, the Court believes that officers can successfully learn to screen out such variables with proper training in NHTSA standards.[21] To counter the forego-

ing concerns, the NHTSA training manual sets forth the proper standards for administering and scoring the HGN test as well as detailed instructions regarding test conditions. *See NHTSA Training Manual.* Moreover, the weight of the experts' testimony at the evidentiary hearings before this Court clearly established that the validity and reliability of the principles underlying the HGN test are commonly accepted within the relevant medical and scientific disciplines. Accordingly, in spite of the number of potential concerns, the Court finds that when properly administered and scored by a qualified officer the HGN test is a reasonably reliable indicator of alcohol impairment.

### 2. *Unfairly Prejudicial*

■■■ In addition, the Court is not persuaded, just as the Oregon Supreme Court in *O'Key* was not persuaded, that the probative value of HGN evidence is substantially outweighed by its potential prejudicial effect.[22] 899 P.2d at 689. Through cross-examination and other testimony, opposing counsel can undermine the credibility of the proffered HGN evidence by showing that there are numerous causes of nystagmus other than alcohol and that there exists a risk of misdiagnosis because of roadside conditions. As with other field sobriety tests, the results of the HGN test may be attributable to physical and/or mental conditions other than alcohol that may lead the jury to reject or give little weight to the evidence. This, however, does not lead the Court to believe that the admission of HGN evidence with the proper foundation will be unfairly prejudicial in any man-

---

standard DUI case such extremes in blood alcohol content are not normally found. Rather, the blood alcohol content in such cases is within the mid-range values—from 0.05—0.13. The defendant maintains that the HGN test is less reliable in predicting blood alcohol in the mid-range levels and, therefore, is less reliable in the standard DUI case.

21. Dr. Forkiotis and Dr. Lui both testified that pursuant to NHTSA guidelines officers are specifically taught that non-alcohol induced nystagmus is distinguished from alcohol induced nystagmus because it is typically asymmetrical, whereas, alcohol induced nystagmus is found in both eyes.

22. The *O'Key* court specifically found that "when offered as evidence that the driver was under the influence of alcohol, HGN is relevant ... because it would tend to make more probable the existence of the consequence fact of being under the influence of intoxicating liquor than without such evidence. That there may be explanations other than the use of alcohol does not diminish the relevance of the evidence." 899 P.2d at 686. The court was not persuaded that HGN evidence was unfairly prejudicial because it believed that opposing counsel would be given every opportunity at trial through cross-examination and rebuttal to attack the relevance or probative value of the evidence. *Id.* 899 P.2d at 688–89.

ner. On the contrary, in the Court's view, the admission of HGN evidence for the limited purpose of establishing that the defendant was "under the influence" of alcohol will clarify the evidence, not confuse the jury nor prejudice the defendant.

 Nonetheless, the Court is concerned that attempts may be made by untrained officers or prosecutors to use the HGN test as a means to quantify a suspect's BAC. This, the Court finds would be unfairly prejudicial and, therefore, rules that the test may not be admitted for such purpose. When referring to the tests to be administered to determine BAC, the Delaware statute speaks in terms of "chemical test" and taking blood, urine and breath samples from the defendant for analysis. 21 *Del.C.* § 4177(c)(1), (2) & (6). The use of HGN test results as conclusive proof that a defendant's BAC exceeded or equalled a specific percentage could pose a number of potential due process concerns. *See Superior Court,* 718 P.2d at 181. Moreover, there exists far more accurate chemical testing devices for detecting BAC than the HGN test. As such, the Court finds that testimony on HGN test results is not admissible as conclusive proof that a driver's blood alcohol content exceeded 0.10 in violation of 21 *Del.C.* § 4177(a)(4) & (a)(5). Therefore, a properly qualified officer may only testify on how he or she performed the test, what he or she observed from defendant's performance of the test (i.e., that the defendant exhibited a lack of smooth pursuit, distinct nystagmus prior to 45 degrees, and distinct nystagmus at maximum deviation), and what he or she concluded about the state of the defendant's intoxication from the defendant's performance on the test when considered with the results of other properly administered field sobriety tests. The Court specifically rules that officer may not indicate what he or she believed the defendant's actual BAC level to be or give any estimates of the BAC based upon his or her training and experience in using the HGN test.

### 3. *Expert's Qualification*

 Having concluded that HGN is reasonably reliable and not unduly prejudicial, the Court is now left with the question of whether Delaware police officers are sufficiently qualified to testify as scientific experts on the correlation between alcohol and gaze nystagmus and their observations of such alcohol induced nystagmus in the defendant. The Court does not doubt that police officers can be fully trained to administer the HGN test and observe the occurrence of alcohol induced nystagmus in the defendant. However, the Court is troubled by the limited training in HGN provided to Delaware police officers and does not believe that with such limited training the officers possess the requisite scientific expertise necessary to attribute test findings to a particular cause. The Court is not satisfied that three days (or twenty-four hours) of general DUI training, which only partly addresses HGN procedures, sufficiently qualifies officers to testify as experts on the correlation between alcohol ingestion and gaze nystagmus, how other possible causes might be masked, what margin of error has been shown in statistical surveys and the cause of observed symptoms of nystagmus. Because jurors may overestimate the probative value of HGN evidence and attribute an "aura of special reliability and trustworthiness" to such evidence, the Court believes that an expert with more indepth experience in the underlying scientific principles of HGN and the use of the test in DUI prosecutions must testify in addition to the arresting officer.[23] The Court also finds that additional expert testimony on HGN evidence is necessary to balance the testimony of the arresting officer, whose bias towards supporting his arrest could cause an inappropriate advocation of the reliability of the test that is unsupported by his training or experience.

Caselaw from other jurisdictions that refers to officer qualifications to administer the HGN test and present testimony relative thereto supports the Court's foregoing determination. *See, e.g., State v. Barker,* 179

---

23. The Court recognizes that with proper training and experience as set forth in this Opinion the arresting officer may also become a qualified expert. However, under the present training procedure this generally will not be the case.

W.Va. 194, 366 S.E.2d 642 (1988) (requiring expert testimony regarding HGN's scientific reliability and acceptance prior to admission of such evidence); *Commonwealth v. Miller*, 367 Pa.Super. 359, 532 A.2d 1186 (1987) (same); *State v. Borchardt*, 224 Neb. 47, 395 N.W.2d 551 (1986) (same). A great majority of the courts that admit HGN evidence with the testimony of only the arresting officer, do so with caution, stressing the officers' extensive education and experience in the HGN test that qualifies them to testify as experts on the test.[24] In fact, a Maryland appellate court recently reversed and remanded a DUI conviction because the State failed to lay the proper foundation on the arresting officer's qualifications for administering the test and testifying as the sole expert witness on HGN. *Schultz*, 664 A.2d at 76 (taking judicial notice of HGN test, however, reversing and remanding case for improper foundation on officer's actual level of training, whether it was complete and properly supervised by certified instructions, and whether the officer was certified in HGN).

Based on the foregoing, the Court finds that prior to the admission of HGN evidence the State must provide a proper foundation for the evidence by presenting testimony from an expert with specialized knowledge and training in HGN testing and its underlying principles. The foundation testimony need not come from a scientific or medical expert; testimony from a Delaware police officer with specialized training in HGN will suffice.[25] The Court does not believe that the foregoing places an untenable burden on the State, particularly with the overwhelming reliance by law enforcement officers on the intoxilator or blood testing to determine an individual's BAC. The Court's decision merely ensures that the jury will accord the proper weight to HGN evidence. In the case *sub judice*, the Court will admit HGN evidence against the defendant, Ronald Ruthardt, if the State presents witnesses consistent with this opinion.

## V. *Conclusion*

In sum, after fully reviewing the expert testimony from the evidentiary hearings, consulting the relevant literature and considering the caselaw from other jurisdictions, the Court finds that HGN evidence satisfies the pertinent Delaware Rules of Evidence governing the admission of new or novel scientific evidence. The Court is convinced that HGN evidence is sufficiently reliable and not unfairly prejudicial to be admitted for probable cause purposes and, with the proper foundation from an expert in HGN, as substantive evidence that the driver is "under the influence of intoxicating liquor." The HGN pass or fail test results may be admitted in evidence to corroborate or attack, but not to quantify, the chemical analysis of the driver's blood, breath or urine. In absence of a chemical analysis, the test results are admissible, as is other evidence of the defendant's behavior, to circumstantially prove that the driver was "under the influence" in violation of 21 *Del.C.* § 4177(a)(1)–(3).

The Court's holding does not grant the State permission to offer the HGN pass or fail test result as conclusive proof that the defendant's blood alcohol content equals or exceeds .10. Testimony quantifying the de-

---

24. *See, e.g., Emerson*, 880 S.W.2d at 766 (finding that prior to admission of HGN evidence with only testimony from arresting officer as foundation, Texas police officers must be certified by completing an NHTSA-approved forty hour training course on HGN, in which the officer evaluates and documents thirty-five HGN test cases); *Murphy*, 451 N.W.2d at 156 (emphasizing the officer's extensive training and experience in finding that proper foundation laid on arresting officer's qualifications and training in HGN, and admitting evidence without further scientific testimony on such evidence; the arresting officer was an eleven year veteran who had specialized in the administration of the HGN test and was a certified instructor); *Garrett*, 811 P.2d at 491 (finding testing officer sufficiently qualified to testify as an expert in HGN where officer attached to Select Traffic Enforcement Team, was an instructor in use of field sobriety tests and specially trained in HGN, and had attended seminars on field sobriety testing conducted by Dr. Burns).

25. In fact, it appears to the Court that Detective Mark Hawk, or an officer with similar specialized expertise, may be fully qualified to testify as an expert on HGN evidence if that officer's background and training are fully disclosed during the trial. The Court, however, will not specifically make this finding at this time.

 

fendant's blood alcohol level is inadmissible in any manner, including the mere estimate by the officer that the defendant's blood alcohol level exceeded 0.10. *See, e.g., Schultz,* 664 A.2d at 69; *Superior Court,* 718 P.2d at 182. Moreover, admissibility of HGN evidence is subject to a proper foundational showing from an expert specializing in HGN consistent with this opinion.

Accordingly, for the foregoing reasons, the State's Motion in Limine is GRANTED.

IT IS SO ORDERED.