## STATE OF CONNECTICUT *v.* GARY L. CARLSON

Superior Court        Geographical Area No. 11   File No. MV96183900S
at Putnam

Memorandum filed July 28, 1998

*Roger Caridad*, assistant state's attorney, for the state.

*Stephen Cashman*, for the defendant.

## I

## INTRODUCTION

SCHUMAN, J. The defendant, Gary L. Carlson, who is charged with operating a motor vehicle while under

the influence of intoxicating liquor, has moved in limine to exclude from trial evidence concerning a field sobriety test known as the horizontal gaze nystagmus (HGN) test. The test was administered to him by the Connecticut state police during a roadside stop on October 6, 1996, in Windham. The defendant claims primarily that the test is not reliable and does not meet Connecticut's standards for the admission of scientific evidence. For the reasons that follow, this court denies the motion in limine.[1]

To conduct the HGN test, a police officer moves his finger or a pencil laterally from a midline point twelve to fifteen inches directly in front of the subject's eyes to an endpoint that represents the limit of one's sideways gaze. The police officer will normally look for three clues: (1) whether the eyes follow the target with smooth pursuit; (2) the extent to which the eyes exhibit any jerkiness, which is known as nystagmus, at the point of maximum sideways deviation; and (3) whether the eyes exhibit any nystagmus before a sideways movement of forty-five degrees. Lack of smooth pursuit, readily apparent nystagmus at maximum deviation, and early onset of nystagmus are indications that the subject has failed the test. The officer will look for each of these three signs in each eye, for a total of six clues. The presence of four or more clues constitutes a failure on the test. See *State* v. *Merritt*, 36 Conn. App. 76, 84–85, 647 A.2d 1021 (1994), appeal dismissed, 233 Conn. 302, 659 A.2d 706 (1995); J. Richman & J. Jakobowski, "The Competency and Accuracy of Police Academy Recruits in the Use of the Horizontal Gaze Nystagmus Test for Detecting Alcohol Impairment," 47 New Eng. J. of Optometry 5, 7 (1994).

---

[1] This court denied the motion orally on July 16, 1998, at the conclusion of the hearing in court on the motion in limine and stated that it would probably detail its findings in a memorandum of decision. This memorandum followed.

II

Prior to 1997, the governing standard in Connecticut for the admission of scientific evidence, particularly that of innovative scientific techniques, was that derived from *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). See *State* v. *Borrelli*, 227 Conn. 153, 163–64, 629 A.2d 1105 (1993). The *Frye* test required that, to be admissible, scientific evidence must have gained "general acceptance in the particular field in which it belongs." *Frye* v. *United States*, supra, 1014.

In *State* v. *Merritt*, supra, 36 Conn. App. 91, the Appellate Court held that "as a precondition to the admission of testimony concerning HGN testing and results, the party introducing the testimony must establish, pursuant to *Frye*, the general acceptance of the HGN test." Because the state had not done so in that case, the Appellate Court held that the trial court had abused its discretion in admitting HGN evidence. Id.

The *Merritt* court acknowledged that in 1993 the United States Supreme Court, in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), had held that the *Frye* test no longer governs as a matter of federal law. *State* v. *Merritt*, supra, 36 Conn. App. 79–80 n.2. But the *Merritt* court made clear that, at the time, our own Supreme Court had not squarely addressed whether the *Daubert* approach, which focused on scientific validity or reliability; *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 592–93; superseded *Frye* as a matter of state law. *State* v. *Merritt*, supra, 79–80 n.2.

In *State* v. *Porter*, 241 Conn. 57, 68, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), our Supreme Court explicitly held that "the *Daubert* approach should govern the admissibility of scientific evidence in Connecticut." This holding did not, however, represent a complete

abandonment of the *Frye* test. Rather, the *Frye* test serves now as an "important factor" in the trial judge's assessment. Id., 84. Indeed, "if a trial court determines that a scientific methodology *has* gained general acceptance, then the *Daubert* inquiry will generally end and the conclusions derived from that methodology will generally be admissible." (Emphasis in original.) Id., 85.

The *Porter* court added that, in the event a scientific principle has not gained general acceptance, a proponent may still establish its reliability or validity by other means. Id., 84–85. Among the many factors that a proponent may rely on are: whether the methodology has been tested and subjected to peer review, the known or potential rate of error, the extent to which the scientific technique relies on subjective interpretations and judgments by the testifying expert, whether the testifying expert can present the methodology in a manner that the fact finder can reasonably draw its own conclusions therefrom, and whether the proffered expert testimony was developed solely for in-court use. Id., 85–86. In addition, the prestige and background of the testifying expert witness can play a role in determining whether a novel technique employed by that individual is likely to have scientific merit. Id., 86.

As far as can be determined, no Connecticut court has assessed the validity of HGN evidence under the *Porter* standards. This court will now proceed to do so.

### III

At the hearing on the motion in limine, the defendant did not call any witnesses. The state presented the testimony of Jack E. Richman, an optometrist and a professor at the New England College of Optometry in Boston, Massachusetts. For the past nine years, Richman has instructed police officers on how to administer and

assess the HGN test. Richman has written one published article on the HGN test; see J. Richman & J. Jakobowski, supra, 47 New Eng. J. of Optometry 5; and has several others in progress. Richman has testified as an expert on the HGN test over a dozen times in various states.[2]

Richman testified that the HGN test is generally accepted in the optometric community as a reliable indicator of alcohol or other impairment. As Richman observed, optometrists have examined for the presence of nystagmus for over fifty years. The optometric community, according to Richman, and, in fact, the broader medical community, generally accepts the principle that alcohol impairs the ability to hold the eyes steady. The HGN test is an application of this principle. See *State* v. *Ruthardt*, 680 A.2d 349, 357 (Del. Super. 1996).

As Richman noted, however, most practicing optometrists do not routinely perform HGN tests. Rather, the relevant scientific community for the purposes of our inquiry should also include neurology, behavioral psychology, highway safety and forensic science. See *State* v. *O'Key*, 321 Or. 285, 314, 899 P.2d 663 (1995). Drawing from a similar cross-section of disciplines, the National Highway Traffic Safety Administration in 1977 conducted a study that concluded that the HGN test was the most sensitive of six field sobriety tests for assessing whether a driver is legally intoxicated. See *State* v. *Ruthardt*, supra, 680 A.2d 352–53. Today, use of the HGN test to detect motorist impairment by alcohol has spread to every state in the nation. *State* v. *O'Key*, supra, 317.

[2] The court does not suggest that it has conducted an exhaustive hearing on the subject of HGN evidence. Other courts have, however. See *State* v. *Ruthardt*, 680 A.2d 349, 352 (Del. Super. 1996); *State* v. *O'Key*, 321 Or. 285, 288, 899 P.2d 663 (1995). This court relies on the evidence from the hearing in the present case as well as the conclusions and authorities cited in the other cases.

Based on these considerations, a majority of courts has found that the HGN test is generally accepted in the relevant scientific community as a reliable indicator of alcohol impairment. *State* v. *Ruthardt*, supra, 680 A.2d 357–58; see also *State* v. *O'Key*, supra, 321 Or. 314 (explaining finding by Supreme Court of Arizona). This court concurs in this finding.

## IV

This court has examined the other relevant factors under the *Porter* test, even though, as stated, a finding of general acceptance in the scientific community is sufficient to satisfy *Porter*. The HGN test has been the subject of extensive field and laboratory testing and scholarly review. See *State* v. *O'Key*, supra, 321 Or. 309–13; *State* v. *Ruthardt*, supra, 680 A.2d 357. The test results generally show that over 77 percent of the time that a police officer finds a suspect to have failed the HGN test, the suspect is in fact impaired by alcohol. The testing revealed accuracy in the 80 to 96 percent range when the officer detects more than four clues on the HGN test or combined the HGN test with other field sobriety tests. See *State* v. *O'Key*, supra, 309–10; *State* v. *Ruthardt*, supra, 357; J. Richman & J. Jakobowski, supra, 47 New Eng. J. of Optometry 7; G. Good & A. Augsburger, "Use of Horizontal Gaze Nystagmus as a Part of Roadside Sobriety Testing," 63 Am. J. of Optometry & Physiological Optics 467, 470–71 (1986).[3] While the test does yield some false positives due to certain medical conditions, congenital nystagmus, or other causes, police officers are often able to screen out these false positives by asking the suspect certain pertinent questions or by conducting other field sobriety tests. See *State* v. *O'Key*, supra, 312–13.

[3] The 96 percent accuracy reading occurred when officers detected all six clues. See G. Good & A. Augsburger, supra, 63 Am. J. of Optometry & Physiological Optics 470.

The HGN test does rely on some subjectivity in that the officer must correctly move his finger from side to side and correctly assess the response of the suspect's eyes. On the other hand, suspects cannot voluntarily control nystagmus and tolerance to alcohol does not affect the test. Id., 310; G. Good & A. Augsburger, supra, 63 Am. J. of Optometry & Physiological Optics 469. Further, national standards, such as those published in 1984 by the National Highway Traffic Safety Administration exist to guide police officers in executing the test. See *State* v. *O'Key*, supra, 321 Or. 314. Studies have revealed that officers can be readily trained to administer the HGN test and obtain very accurate results. See J. Richman & J. Jakobowski, supra, 47 New Eng. J. of Optometry 8; G. Good & A. Augsburger, supra, 471.

The HGN test was not developed for the purpose of any specific court case but rather to assist police officers in making accurate drunk driving arrests and thereby enhance public safety. See *State* v. *Ruthardt*, supra, 680 A.2d 354; J. Richman & J. Jakobowski, supra, 47 New Eng. J. of Optometry 8. Nonetheless, when a party presents HGN test evidence in court, the test is sufficiently straightforward that "the fact finder can reasonably and realistically draw its own conclusions therefrom." *State* v. *Porter*, supra, 241 Conn. 86.

Taking all these factors into consideration, the court finds that the HGN test evidence satisfies the *Porter* standards and is therefore admissible. Any remaining objections concerning the validity of the test go to its weight, not its admissibility.[4]

---

[4] As the *Merritt* court noted, the fact that the test satisfies the applicable standards for the admission of scientific evidence does not obviate the necessity of also laying a proper foundation with a showing that the officer administering the test had the necessary qualifications and followed the appropriate procedures. *State* v. *Merritt*, supra, 36 Conn. App. 91.